[Crim. No. 18899. In Bank. Feb. 11, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN JACOB McDANIEL, Defendant and Appellant.

## COUNSEL

Ira S. Blatt, under appointment by the Supreme Court, and John Jacob McDaniel, in pro. per., for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Marjory Winston Parker and Paul H. Dobson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WRIGHT, C. J.**—John Jacob McDaniel appeals from a judgment following a jury conviction of assault with intent to commit murder (Pen. Code, § 217) and a court conviction of carrying a concealed weapon within a vehicle after having previously been convicted of a felony (Pen. Code, § 12025). Defendant's pretrial motion to sever the two charges for trial purposes was granted and defendant waived trial by jury as to the concealed weapon charge.

Defendant, who has been represented by counsel throughout the trials and on this appeal, made numerous pretrial motions including motions to proceed in propria persona, to act as co-counsel and to participate in final argument.[1] All such motions were denied pursuant to the then prevailing rule that an accused was without a constitutional right to represent himself against a criminal charge. (*People* v. *Sharp* (1972) 7 Cal.3d 448 [103 Cal.Rptr. 233, 499 P.2d 489].) While this appeal was pending, however, the United States Supreme Court ruled that the denial of the right of self-representation was impermissible under Sixth Amendment mandates. (*Faretta* v. *California* (1975) 422 U.S. 806 [45

---

[1] Defendant was represented by the public defender during the jury trial on the assault charge. After a verdict of guilty private counsel was substituted for purposes of the trial on the concealed weapon charge.

L.Ed.2d 562, 95 S.Ct. 2525].) We conclude that the *Faretta* decision is not to be given retroactive application, and as defendant's other contentions on appeal are not meritorious we affirm the judgment.

The evidence connecting defendant to the charge of assault with intent to commit murder is mainly circumstantial. He was a recent arrival in the Town of Happy Camp. As he sat in his car outside a tavern on a Friday evening, he witnessed a beating administered upon Priscilla Spence by Dale Attebury. Priscilla had lived with Attebury for five years and they had two children. Defendant offered to intervene on Priscilla's behalf but was cautioned by Virgil Doolittle that the altercation was a "family matter" and that defendant should not get involved. Attebury and Priscilla eventually reached an apparent understanding and returned to the tavern.

After the tavern closed for the evening Priscilla and Attebury entered the latter's car and, when they could not get it started, defendant assisted them. Later that evening he attended a party at Priscilla's apartment, also attended by Attebury and Doolittle. On two occasions during the following Saturday and Sunday defendant returned to Priscilla's apartment. On one occasion she gave him directions to a house trailer where Attebury lived. On another occasion he mentioned the beating which had been inflicted upon her by Attebury, asked whether she wished to get rid of him, and told her that if she were so inclined it would cost her nothing if she would "keep [her] mouth shut." Priscilla declined defendant's offer.

On Sunday defendant visited Attebury's house trailer and for several hours drank beer with him and Doolittle. During this time defendant asked what nearby places could be "hit," and stated that he carried explosives and tools in his car and could "knock a bank over." After all three men left the house trailer Attebury and Doolittle drove about in Attebury's car while they continued to drink beer. Finally, early on Monday morning, the car ran out of gasoline and the two men spent the remainder of that night in the car. On Sunday evening defendant visited Priscilla's apartment again for the purpose of borrowing a clothespin.

On Monday morning Doolittle and Attebury returned to the house trailer. Doolittle, with Attebury a few feet to the rear, first opened a heavy outside door of the trailer and as he began to open an inner screen

door the trailer exploded from within. Both men were severely injured.[2] Just after the explosion Attebury saw on the adjoining roadway a car of the same green color as defendant's car with a driver wearing a cowboy hat similar to a hat worn by defendant. Such a car and driver were also seen by Priscilla's daughter as it passed Priscilla's apartment shortly after the explosion. The butane tanks which serviced the house trailer were intact after the explosion and there was a sharp odor of dynamite in the immediate vicinity.

Defendant was arrested in his car about 41 miles from the scene of, and 3½ hours after, the explosion. The car was seized and sealed by arresting officers and later was searched pursuant to a warrant therefor. An investigator, qualified as an expert witness, testified that an explosive charge had been placed inside the screen door and triggered with a pull-type device attached to the door. Traces of dynamite were found in debris at the scene of the explosion and on two pairs of gloves and debris found in defendant's car. A clothespin was also found in defendant's car. During the trial the court permitted the expert to demonstrate a model bomb which incorporated a clothespin as part of a triggering device.

The charge of carrying a concealed weapon in his vehicle is supported by evidence that defendant exhibited a small blue metal gun to Doolittle while the latter sat in defendant's automobile on the Friday preceding the explosion. Defendant removed the gun from and returned it to the glove compartment. The gun, a loaded, operable .38 caliber revolver, was found in the glove compartment after defendant's apprehension and during the search of the vehicle pursuant to the warrant. It also appears that defendant had been convicted in the State of Wyoming of burglary in 1961 and had served a term in the state prison of that state.

### Right of Self-Representation

We first consider defendant's right of self-representation. Such a right is now compelled pursuant to the majority of the Supreme Court's construction of the Sixth and Fourteenth Amendments. (*Faretta v. California, supra,* 422 U.S. 806.) It is clear, however, that the rule announced for the first time in *Faretta* is not one which followed from constitutional concepts directed to according to an accused protections designed to aid in the search for truth or to insure the integrity of the fact-finding process. The majority recognize that the "right of an accused

---

[2]Doolittle lost a leg and the sight of both eyes and suffered numerous lesser injuries including a partial paralysis.

to conduct his own defense seems to cut against the grain of this court's decisions holding that the Constitution requires that no accused can be convicted and imprisoned unless he has been accorded the right to the assistance of counsel. [Citations.] For it is surely true that the basic thesis of those decisions is that the help of a lawyer is essential to insure the defendant a fair trial. . . . It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts." (*Faretta* v. *California, supra,* 422 U.S. 806, 832-834 [45 L.Ed.2d 562, 580-581].)

Notwithstanding the prejudice which an accused may suffer upon self-representation, the right to so penalize himself was deemed by the majority to be grounded on other considerations directed more to the assertion of personal liberties than to the assertion of an effective defense. The majority thus state: "To force a lawyer on a defendant can only lead him to believe that the law contrives against him. . . . The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the life blood of the law.' [Citation.]" (*Id.,* at p. 834 [45 L.Ed.2d at p. 581].)

It is necessary that we recognize the basis for the declared right of self-representation as the retroactive-prospective applicability of the rule depends in part on that basis. The trials in the instant case were completed more than a year in advance of the decision in *Faretta,* and we are thus faced with the question whether the decision must be applied retroactively or only prospectively to those trials which commenced after the date of the filing of the opinion in *Faretta. Faretta* makes no express declaration as to its applicability. ■ However, cases following *Linkletter* v. *Walker* (1965) 381 U.S. 618 [14 L.Ed.2d 601, 85 S.Ct. 1731], have established criteria which govern whether the Supreme Court's constitutional decisions are to be given retroactive application. (See *Desist* v. *United States* (1969) 394 U.S. 244, 249 [22 L.Ed.2d 248, 255, 89 S.Ct. 1030]; *Stovall* v. *Denno* (1967) 388 U.S. 293, 297 [18 L.Ed.2d 1199, 1203-1204, 87 S.Ct. 1967]; *Johnson* v. *New Jersey* (1966) 384 U.S. 719 [16 L.Ed.2d 882, 86 S.Ct. 1772]; *Tehan* v. *Shott* (1966) 382 U.S. 406 [15 L.Ed.2d 453, 86 S.Ct. 459].) In *Halliday* v. *United States* (1969) 394 U.S. 831 [23 L.Ed.2d 16, 89 S.Ct. 1498], the court stated the criteria as being: "(1) the purpose of the new rule; (2) the extent of reliance upon the old

rule; and (3) the effect retroactive application would have upon the administration of justice." (*Id.,* at p. 832 [23 L.Ed.2d at p. 19].) The determination of whether a rule is to be given retroactive application is generally made pursuant to a balancing process, wherein the gain to be achieved in the administration of justice by accomplishment of the purpose of the new rule (the first criterion) is balanced against the adverse effects on the administration of justice resulting from the extent to which the courts have mistakenly but in good faith relied on the prevailing rule (the second criterion) and from an application of the new rule for the purpose of reconsidering determinations already finally made pursuant to the then prevailing rule (the third criterion). (*Stovall* v. *Denno, supra,* 388 U.S. 293, 298 [18 L.Ed.2d 1199, 1204]; see also *Ivan* v. *City of New York* (1972) 407 U.S. 203, 204 [32 L.Ed.2d 659, 661, 92 S.Ct. 1951]; *In re Johnson* (1970) 3 Cal.3d 404, 410 [90 Cal.Rptr. 569, 475 P.2d 841].)[3]

 In considering the first of the criteria of retroactivity of the *Faretta* rule, we discover that it is readily apparent that the purpose of the rule is to secure to an accused the personal freedom to choose how and by whom he will defend against a criminal charge. It is manifest from those portions of the *Faretta* opinion quoted above that compliance with the rule is not intended by the majority of the court in *Faretta* to enhance the reliability of the truth-determining or fact-finding process, as the majority anticipate and indeed concede, that such compliance will most likely have the directly opposite effect. When implementation of the new rule does not in some significant degree aid in the truth-determining process, little or no weight is added to the balance in favor of retroactive application as little or no prejudice in the trial itself is suffered by an accused whose guilt was determined without benefit of the new rule. (*Stovall* v. *Denno, supra,* 388 U.S. 293, 296-299 [18 L.Ed.2d 1199, 1203-1205]; *Johnson* v. *New Jersey, supra,* 384 U.S. 719, 728-729 [16 L.Ed.2d 882, 889-890].)[4]

---

[3] "We here stress that the choice between retroactivity and nonretroactivity in no way turns on the value of the constitutional guarantee involved. . . . We also stress that the retroactivity or nonretroactivity of a rule is not automatically determined by the provision of the Constitution on which the dictate is based." (*Johnson* v. *New Jersey, supra,* 384 U.S. 719, 728 [16 L.Ed.2d 882, 889].)

[4] The right to the assistance of counsel at trial has been retroactively applied, as denial of that right would adversely affect the truth-finding process and almost invariably lead to a denial of a fair trial. (See *Stovall* v. *Denno, supra,* 388 U.S. 293, 297-298 [18 L.Ed.2d 1199, 1203-1204].) The right here asserted by defendant, however, constitutes a waiver of the right of representation by counsel. Even though the *assertion* of that right may adversely affect the truth-finding process, a defendant is now precluded from complain-

Having concluded that accomplishment of the purpose of the new rule affords little or no weight in favor of its retroactive application, we need not seek out substantial countervailing reasons for denying retroactive application of the rule. We note, however, that as to the second criterion the courts of this state have justifiably relied on the rule announced in *People v. Sharp, supra,* 7 Cal.3d 448, now rejected in *Faretta.* We reviewed in *Sharp* the stated views of the United States Supreme Court on the question of self-representation and concluded that in "almost 200 years of constitutional interpretation and construction the Supreme Court has not on any occasion held that the right of self-representation in a criminal trial is constitutionally compelled. . . . Moreover, . . . social and judicial changes which have taken place during the almost 200 years require greater rather than lesser limitations on the right of self-representation." (*Id.,* at p. 457.) We also concluded in *Sharp* that our own Constitution did not then provide a right of self-representation in criminal trials, and subsequent state constitutional amendments have reinforced that conclusion. (*Id.,* at pp. 459-461, app., pp. 463-464.) It thus appears that in view of the Supreme Court's reluctance for almost two centuries to take any position on the question of self-representation, the courts of this state justifiably relied on the rule of our constitutional and decisional law.[5]

The final criterion, the effect of retroactive application of the *Faretta* rule upon the administration of justice, surely swings the scales heavily against retroactive application. Such application could require that convicted persons who unsuccessfully sought at trial to assert a right of self-representation be accorded a new trial wherein they might appear *pro se.* As we must assume that in each such instance the right of self-representation was denied because the accused was not competent to so represent himself (see *People v. Sharp, supra,* 7 Cal.3d 448, 461) or did not have an intelligent conception of the consequences of waiving counsel (see *People v. Siegenthaler* (1972) 7 Cal.3d 465, 471 [103 Cal.Rptr. 243, 499 P.2d 499]), it is manifest that on retrial in the great

---

ing on appeal that he was inadequately represented at trial. (*Faretta v. California, supra,* 422 U.S. 806, 834-835, fn. 46 [45 L.Ed.2d 562, 581]; cf. *People v. Sharp, supra,* 7 Cal.3d 448, 461-462, fn. 12.)

[5] It is sometimes urged that a newly announced rule which merely restates a concept which is inherent in the Constitution should be given retroactive application when the rule is one which may be deemed to have originated with the Constitution and thus has eternal existence. In our view, however, the merit in such contention is merely a factor to be considered in determining the extent of justifiable reliance on the old rule (the second criterion). (See *In re Lopez* (1965) 62 Cal.2d 368, 379-380 [42 Cal.Rptr. 188, 398 P.2d 380].)

majority of cases a different result would not be forthcoming. The state would thus be heavily burdened to retry numerous cases with little likelihood that justice would be served in any of them.

As the *Faretta* rule is one which initially affects the trial of a criminal cause, we deem that the critical date in the resolution of the retroactive-prospective issue is the date upon which a particular trial commenced. (See *People* v. *Sirhan* (1972) 7 Cal.3d 710, 752-753 [102 Cal.Rptr. 385, 497 P.2d 1121] and *People* v. *Feggans* (1967) 67 Cal.2d 444, 448 [62 Cal.Rptr. 419, 432 P.2d 21], holding that newly announced constitutional rules of procedure are not applicable to cases on direct appeal when the event to which the new rule is applicable predated the decision establishing the rule; cf. *People* v. *Rollins* (1967) 65 Cal.2d 681, 686 [56 Cal.Rptr. 293, 423 P.2d 221].) The *Faretta* rule, accordingly, is to be applied only prospectively in those cases wherein an accused sought or seeks to assert his right of self-representation in a trial which has commenced or will commence after June 30, 1975, the date upon which the decision in *Faretta* was filed.[6]

---

[6]Although we need not reach the issue, we note the showing which must be made by an accused who seeks to assert his right of self-representation. Apparently because the assertion of the right of self-representation also constitutes a waiver of the right to counsel, the court must determine on the record that the accused make a "knowing" exercise of the right to defend *pro se.* The Supreme Court stated: "The record affirmatively shows that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed free will. . . . We need make no assessment of how well or poorly Faretta had mastered the intricacies of [rules of law]. . . . For his technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself." (*Faretta* v. *California, supra,* 422 U.S. 806, 835-836 [45 L.Ed.2d 562, 582].)

We also do not reach the issue of an accused's right to represent himself on appeal, as defendant has not asserted such a right in these proceedings. He has, however, personally filed a supplemental opening brief, a reply brief and petitions for the writ of habeas corpus with points and authorities. We have considered all of defendant's filings, including the petitions for the writ, which we have treated as additional briefs on this appeal.

Although we conclude that *Faretta* is not applicable because it postdated the commencement of trial herein, we note that in *United States* v. *Swinton* (S.D.N.Y. 1975) 400 F.Supp. 805, it was held that *Faretta* was not applicable to confer co-counsel status on an accused who, like defendant, sought such status as to the assault charge and trial.

Under the applicable law defendant would be entitled to relief on appeal if it appears that the trial court abused its discretion in concluding under *Sharp* that defendant could not competently represent himself. Our review of defendant's numerous pretrial and other filings in the trial court compel us to the conclusion that there was no abuse of discretion. (See *People* v. *Floyd* (1970) 1 Cal.3d 694, 702-703 [83 Cal.Rptr. 608, 464 P.2d 64].)

### Sufficiency of Affidavit in
### Support of Search Warrant

Defendant complains on the merits of certain trial court rulings which he asserts were prejudicially erroneous. He contends first that an affidavit in support of the warrant which authorized the search of his car was insufficient to support the magistrate's finding of probable cause and that evidence seized pursuant to the warrant therefor should have been suppressed. Defendant made a pretrial motion to exclude evidence pursuant to Penal Code section 1538.5 wherein he unsuccessfully sought the suppression of the same evidence. We set forth the substance of the affidavit in the margin.[7]

■ Defendant first attacks the affidavit on the ground that certain of the factual matters therein were improperly included. He urges that statements attributed to Attebury in which he purported to repeat conversations wherein defendant had asserted his skills with and inclinations to use explosives for criminal purposes, do not satisfy the requirements of the "first prong" of *Aguilar* v. *Texas* (1964) 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509]. (See *Spinelli* v. *United States* (1969) 393 U.S. 410, 412-413 [21 L.Ed.2d 637, 641-642, 89 S.Ct. 584].) We have held that the first prong of the *Aguilar* test requires that "the affidavit [for issuance of a search warrant] must allege the informant's statement in language that is factual rather than conclusionary and must establish that the informant spoke with personal knowledge of the matters contained in the statement. . . ." (*People* v. *Hamilton* (1969) 71 Cal.2d 176, 179-180 [77 Cal.Rptr. 785, 454 P.2d 681]; see also *People* v. *Superior Court (Johnson)*

---

[7]The affidavit was signed by an investigating officer who stated, based on his personal investigations and observations, that when Doolittle attempted to open the door to Attebury's house trailer an explosive device was thereby tripped, seriously injuring Doolittle and Attebury. The affiant also related that immediately following the explosion Attebury had stated to another officer he believed that "John" was responsible for the explosion because "John" had stated that he had burglarized a business establishment and had explosives which he planned to use to commit another burglary; that Attebury had stated to a hospital attendant that "John" constantly talked about blowing things up; that Attebury stated that he had seen "John" driving his vehicle in the vicinity of the trailer on the morning of the explosion and that "John" had been in the trailer on the day before the explosion; that an investigation had disclosed that a John McDaniel (defendant), who had a Colorado address, had cashed a check at a tavern at about the time when Attebury had stated he was in the tavern with defendant; that defendant was arrested while driving a green sedan with a Colorado license; that the vehicle, for which authority to search was sought, had been sealed and stored since defendant's arrest; and that following his arrest defendant had told an officer that he was knowledgeable in the use of explosives and there could be some explosives in his car, although he did not think there were.

(1972) 6 Cal.3d 704, 711 [100 Cal.Rptr. 319, 493 P.2d 1183].) Defendant contends that the affidavit does not indicate to whom, when, or where defendant made the incriminating statements, and that the affidavit thus fails under *Aguilar* and *Hamilton* to establish that Attebury spoke with personal knowledge of the matters contained in the statement.[8]

An affidavit in support of a search warrant is to be read as a whole and in a common sense manner. (*People* v. *Superior Court (Johnson), supra,* 6 Cal.3d 704, 711.) Although the affidavit does not expressly disclose when, where or to whom the incriminating statements were made by defendant, other matters set out in the affidavit justify reasonable inferences that the statements were made in Attebury's presence at times and places referred to in the affidavit. Thus the affidavit relates that Attebury had stated that "John," a person otherwise fairly identified in the affidavit as defendant, had been in Attebury's house trailer and had met with Attebury at a tavern on the day and evening preceding the explosion and that defendant talked "all the time" of blowing things up. The affidavit also recites disclosures by defendant of the means by which he had committed one crime and of his intentions to commit a similar crime.[9]

Such disclosures contain more substantial information than that which reasonably might be expected if the source of Attebury's information was a casual rumor or based on general information. (See *People* v. *Hamilton, supra,* 71 Cal.2d 176, 180-181.) The affidavit further recites that the police had conducted independent investigations which corroborated in part inferences that Attebury had personal knowledge of defendant's incriminating statements. Thus the affidavit states that a person, presumably defendant, had cashed a check at the tavern at about the time Attebury purportedly met with defendant at the tavern. When an informer's tip fails to fully satisfy the requirement of reliability, that

---

[8]Defendant does not challenge the affidavit on the second prong of the *Aguilar* test. That portion of the test requires that "the affidavit must contain some underlying factual information from which the magistrate issuing the warrant can reasonably conclude that the information was credible or his information reliable." (*People* v. *Hamilton, supra,* 71 Cal.2d 176, 180.) The test is satisfied by averments that Attebury was a citizen informant and a victim of the crime. The credibility of such an informant is accorded great weight. (See *People* v. *Hogan* (1969) 71 Cal.2d 888, 890-891 [80 Cal.Rptr. 28, 457 P.2d 868]; *People* v. *Zimnicki* (1972) 29 Cal.App.3d 577, 582 [105 Cal.Rptr. 614].)

[9]The affidavit recites as follows: "While in the emergency room at Rogue Valley Hospital Dale Attebury stated to the Siskiyou County Sheriff's Deputy Paul White that he believes the bombing was done by a person known to him as 'John.' Attebury's reason for this belief is statements made by 'John' that he, 'John,' had explosives and torches for the purpose of burglarizing a business in Happy Camp. 'John' further spoke of having burglarized a business in Orleans."

requirement may nevertheless be satisfied if the tip is corroborated by independent investigation. (*People* v. *Benjamin* (1969) 71 Cal.2d 296, 301-303 [78 Cal.Rptr. 510, 455 P.2d 438].) In view of the foregoing it is manifest that *Aguilar* did not require that the magistrate, in judging the sufficiency of the affidavit, exclude therefrom the incriminating statements made by defendant and repeated to law enforcement officers by Attebury.[10]

■ Defendant next contends on *Miranda* grounds (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) that the recital in the affidavit that he had acknowledged that he was experienced in the use of explosives and that there might be some explosives in his car, was also improperly before the magistrate and could not be considered in judging the sufficiency of the affidavit. He contends that police officers had extracted the incriminating statement appearing in the affidavit without providing counsel to defendant although he had made at least two requests for counsel after his arrest. ■ "If [a suspect in custody] states that he wants an attorney, the interrogation must cease until an attorney is present" and "any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." (*Id.,* at p. 474 [16 L.Ed.2d at p. 723]; see also *People* v. *Randall* (1970) 1 Cal.3d 948, 954-955 [83 Cal.Rptr. 658, 464 P.2d 114].)

■ The challenged incriminating statement was, according to defendant, the result of a post-arrest interrogation. At the hearing on the motion to suppress evidence seized pursuant to the warrant, defendant testified that on the evening of the day of his arrest he was advised that an acetone swab test was to be performed for the purpose of determining the presence of nitrates on his hands; that he asked that an attorney be present; that he was advised that the presence of an attorney was not required (see *United States* v. *Wade* (1967) 388 U.S. 218, 227 [18 L.Ed.2d 1149]; *Schmerber* v. *California* (1966) 384 U.S. 757 [16 L.Ed.2d 908, 86 S.Ct. 1826]); and that an officer then commenced an interrogation which led to the statement which defendant sought to have excluded from the

---

[10] Defendant urges that this case is governed by *Price* v. *Superior Court* (1970) 1 Cal.3d 836 [83 Cal.Rptr. 369, 463 P.2d 721], insofar as the *Aguilar* issue is concerned. In *Price* we held that hearsay statements in an affidavit could not be considered in evaluating the sufficiency of the affidavit in support of a search warrant. *Price* is clearly distinguishable. The informant in that case was unidentified, the hearsay statements did not appear to have been made in his presence, and there was no corroboration from which it might be inferred that the informant had personal knowledge of the hearsay statements.

affidavit for purposes of evaluating it. Defendant had been advised of his *Miranda* rights at the time of his arrest.

An officer who conducted the testing for nitrates disputed defendant's version of the foregoing events. The officer testified that defendant first acknowledged that he had been advised of and understood his *Miranda* rights; that defendant then asked the purpose of the test for nitrates; that the officer explained that the test could produce evidence that defendant had recently handled explosives if in fact he had; and that defendant first volunteered innocent reasons why there may be nitrates on his hands and thereupon volunteered the statement acknowledging his familiarity with explosives and the possibility that explosives were in his car.[11]

Statements volunteered when not in response to an interrogation are admissible against a defendant, even after an initial assertion of the right to remain silent. (*People* v. *Randall, supra,* 1 Cal.3d 948, 956, fn. 7; *People* v. *Ireland* (1969) 70 Cal.2d 522, 536 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].) The issue is thus whether the statement was volunteered or was the product of police interrogation. The issue has been resolved on substantial evidence contrary to defendant's claims and we are bound by that resolution on appeal. (*People* v. *Long* (1970) 6 Cal.App.3d 741, 747 [86 Cal.Rptr. 227]; *People* v. *Lee* (1970) 3 Cal.App.3d 514, 525 [83 Cal.Rptr. 715].) The statement is thus properly included within the affidavit in judging its sufficiency in support of the search warrant.

Defendant makes still another contention that material should be excluded from the affidavit. This contention relates to the accuracy of the statement attributed in the affidavit to Attebury that he had observed a car driven by defendant near the scene of the explosion. Exclusion of the statement for purpose of evaluating the sufficiency of the affidavit is sought on the ground that when it appears on review that a statement relied on by the magistrate who issued the warrant was in fact false, and that the affiant should have reasonably known the statement to be false, such statement must be excluded for purposes of evaluation of the sufficiency of the affidavit on review. (*Theodor* v. *Superior Court* (1972) 8 Cal.3d 77, 97, 100-101 [104 Cal.Rptr. 226, 501 P.2d 234].)

---

[11]Defendant asserted that he had shot a gun and had urinated on his hands without having washed them. The test was negative, however. Dynamite debris was found in defendant's car.

*Theodor* does not support defendant's contention. It does not state a rule for evaluation of an affidavit on appeal from a judgment following conviction, but rather states a rule applicable to evaluation of an affidavit on motion to suppress evidence. (Pen. Code, § 1538.5.) We held in *Theodor* that a defendant who challenges on a motion to suppress evidence the accuracy of a statement in an affidavit has the burden of establishing such inaccuracy and that when established the prosecution has the burden of demonstrating the reasonableness thereof. (*Theodor* v. *Superior Court, supra,* 8 Cal.3d 77, 103-104.)

In the instant case defendant moved pursuant to section 1538.5 to suppress evidence claiming, inter alia, inaccuracies in the affidavit. The parties stipulated that the transcript of the preliminary hearing be received in evidence at the hearing on the motion and, after briefing and argument, the motion was denied. Our examination of the record of materials available to the court when ruling on the motion to suppress discloses that Attebury testified at the preliminary hearing that as he lay on the ground following the explosion he thought he had seen defendant's car go by and that he had guessed that defendant was the driver. It was also made to appear that the statement in the affidavit, although not made directly to the affiant, was made to Attebury's brother, who had immediately arrived at the trailer following the explosion and had repeated the statement to police officers. It thus appears that Attebury's statement in the affidavit might be deemed inaccurate only insofar as it recited that Attebury *had seen* defendant drive by whereas it appeared at the hearing on the motion that Attebury then made the somewhat less positive statement that he *believed he had seen* defendant drive by. Certainly the court in denying the motion to suppress was entitled to conclude that defendant had failed to establish that the statement in the affidavit was inaccurate or, if it had so concluded the court was entitled to further conclude that the prosecution had carried its burden of demonstrating the reasonableness of the affiant's reliance. (*Theodor* v. *Superior Court, supra,* 8 Cal.3d 77, 102.) In either event *Theodor* does not now aid defendant.

■ We conclude, contrary to defendant's further contention, that the affidavit as a whole sufficiently supports the search warrant. It recites or reasonably implies in support of the victim's conclusion that defendant had caused the explosion, that an explosive charge had been detonated by a device set in the house trailer; that a person fairly identified therein as defendant had visited the trailer the day before and had spoken of his abilities and inclination to use explosives for criminal purposes; that

defendant's vehicle was seen in the immediate vicinity of the explosion; that defendant had acknowledged following his arrest on suspicion of having set the explosive device that he was experienced in the use of explosives and that there may then be some explosive materials in his car. Certainly the affidavit sets forth facts such as would lead a man of ordinary caution or prudence to believe and conscientiously entertain, a strong suspicion that there was evidence of criminal conduct in defendant's car. (See *People* v. *Stout* (1967) 66 Cal.2d 184, 193 [57 Cal.Rptr. 152, 424 P.2d 704].) Where, as here, there is a substantial basis for the magistrate to have concluded that evidence of criminal conduct was present in the vehicle, his determination will be sustained. (*Skelton* v. *Superior Court* (1969) 1 Cal.3d 144, 150 [81 Cal.Rptr. 613, 460 P.2d 485]; *People* v. *Benjamin* (1969) 71 Cal.2d 296, 302 [78 Cal.Rptr. 510, 455 P.2d 438].)

### The Model Explosive Device

■ Defendant complains that because the People failed to establish a foundation that a model bomb prepared by an expert witness was substantially and approximately a model of the type which was exploded in the house trailer, the court committed prejudicial error in receiving the model in evidence to aid the jurors in understanding the expert's testimony. The model illustrated how it would be possible by applying pressure to a triggering device to cause an electrical circuit to close and a dynamite cap to detonate, in turn detonating a charge of dynamite. Neither a cap nor dynamite was used in the model, and an electric lamp was used to demonstrate the closing of the electrical circuit when force was applied to the triggering device.

The witness testified that he had received training in homemade explosive devices, that his model was illustrative of one of several types of explosive devices which could be activated by the movement of an element of the device known as the trigger, that the trigger could be one of several mechanisms (a mercury switch, a metal washer through which a piece of metal could be inserted and suspended, a mousetrap or clothespin with a piece of cardboard inserted between wired contact points), and that the model he had prepared and the triggering device he had used were not intended to illustrate the mechanism which was actually used to detonate the charge of dynamite in the instant case. The triggering device used in the model was a clothespin, the wired prongs of which were held apart by cardboard. When the cardboard was pulled from between the prongs the wires came into contact, closing the circuit

and causing the flow of electricity. The device' could be cocked by attaching the cardboard to a string or wire, the other end of which was attached to a door. When the door was opened the cardboard would be pulled from between the prongs, triggering the device.

Defendant objected to the use of a clothespin with the model as there was evidence that defendant had borrowed a clothespin from Priscilla's daughter on the day before the explosion. The court, in overruling the motion outside the presence of the jury, required the prosecution to explain through its expert witness that a clothespin was only one of a number of devices which might have been used to trigger a bomb. The witness further testified that he did not know what device was actually used and that he had used a clothespin in his model only because it was easily available to him.[12]

Defendant's contentions of undue prejudice by the prosecution's utilization of the model is not supported by the record. The role of the clothespin was not emphasized, and the court carefully kept the use of the model and implications therefrom in proper perspective. There was no abuse of discretion in permitting the use of the model under the conditions imposed by the court. (See *People* v. *Kynette* (1940) 15 Cal.2d 731 [104 P.2d 794]; *Church* v. *Headrick & Brown* (1950) 101 Cal.App.2d 396, 415 [225 P.2d 558].) Defendant's further contention that the prosecution failed to establish a proper foundation for admission of the model is not only without merit,[13] but also cannot be urged by defendant for the first time on this appeal. (Evid. Code, § 353; *People* v. *Williams* (1970) 11 Cal.App.3d 970, 979 [90 Cal.Rptr. 292].)

### *Evidence of Other Criminal Conduct*

■ Defendant next complains of improprieties in the receipt of evidence that he had committed another crime. (See *People* v. *Albertson*

---

[12]Defendant testified that he used the borrowed clothespin to attach a road map to the dashboard of his car, and when arrested in his car a clothespin was attached to the dashboard in a manner which would serve the purpose claimed by defendant for borrowing the clothespin. No clothespin or portion thereof was found in the debris at the trailer.

[13]The expert also testified that based upon his investigations and conclusions, the explosion was the result of a triggering device placed immediately adjacent to the screen door and triggered by an external movement. As above indicated, the model and its demonstration by the expert was received for the limited purpose of aiding the jurors in understanding the expert's testimony as to a manner in which such a device might have been triggered, and it was carefully explained to the jurors that the model did not purport to depict the device which did in fact trigger the explosion.

(1944) 23 Cal.2d 550, 577-578 [145 P.2d 7].) Attebury testified that during their conversation in the trailer on Sunday defendant "said something about when he went through Orleans [a nearby town] that some bar would be missing something when they opened up the next day or something." Defense counsel objected "to the line of questioning on the grounds of relevancy" only when the prosecutor asked Attebury if there had been "any further conversation along that line." The objection was overruled. Attebury further testified that defendant asked what places might be "hit" around Happy Camp and that when advised there was an all night patrol in Happy Camp defendant stated that it would not take him "too long to get into a place" as "he had explosives and stuff, tools to work with."

The matters testified to by Attebury after defense counsel's objection were clearly relevant and defendant does not now urge error in the receipt of such testimony. (See *People* v. *Schader* (1969) 71 Cal.2d 761, 772 [80 Cal.Rptr. 1, 457 P.2d 841].) He challenges only the testimony relating to the bar in Orleans. However, the objection at trial was not made on the ground that the testimony disclosed the commission of another crime and was not made in a timely manner if directed to that ground. There was, moreover, no motion to strike the reference to such other crime (see Evid. Code, § 353, subd. (a); *People* v. *Williams, supra,* 11 Cal.App.3d 970), and we are satisfied that the receipt of such evidence, if erroneous, could not have resulted in a miscarriage of justice (see Evid. Code, § 353, subd. (b); *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]).

■ Defendant further complains of prosecutorial misconduct when reference was made in closing argument to defendant's other conduct which may have been criminal.[14] There was no objection or motion to strike the prosecutor's remarks, perhaps because such a motion would necessarily fail in view of the fact that the remarks were permissible deductions grounded on evidence of record. (See *People* v. *Beivelman* (1968) 70 Cal.2d 60, 76 [73 Cal.Rptr. 521, 447 P.2d 913].) Even assuming prosecutorial misconduct defendant cannot object unless the misconduct can be said to have contributed materially to the verdict in a closely balanced case or is of such a nature that it could not have been cured by a proper and timely admonition. (See *People* v. *Perry* (1972) 7 Cal.3d

---

[14]The prosecutor argued that defendant may have been motivated to "eliminate" Doolittle and Attebury because he had told them about the bar incident and they "would be able to put the finger on [defendant] in case there was any investigation."

756, 790 [103 Cal.Rptr. 161, 499 P.2d 129].) Neither exception to the rule is applicable here.

### Denial of Motion for New Trial

Defendant urged four principal grounds in support of a motion for a new trial, none of which is meritorious. A motion for a new trial is made to the sound discretion of the court, and its ruling will not be disturbed except on a showing of clear abuse. (*People* v. *McGarry* (1954) 42 Cal.2d 429, 432-433 [267 P.2d 254].)

 Defendant contends first that the motion for a new trial should have been granted because the prosecutor was guilty of misconduct in arguments which posed to the jury the proposition that if defendant did not commit the crime, who did? It is contended that such argument constituted an attempt to shift the burden of proof. It appears, however, that the prosecutor was merely responding to a defense counsel argument that other persons may be responsible for the bomb.[15] The prosecutor reviewed the record and surmised that there was no believable evidence that such a person existed. No shift in the burden of proof was suggested to the jurors, as the prosecutor stated that if the jurors were to find that the crime was perpetrated by someone else than defendant they could exclude the defendant if there was "some reasonable doubt in your mind based on some evidence which was produced in the court." We conclude that there is no misconduct and note, moreover, that even otherwise prejudicial prosecutorial argument, when made within proper limits in rebuttal to arguments of defense counsel, do not constitute misconduct. (*People* v. *Hill* (1967) 66 Cal.2d 536, 559-561 [58 Cal.Rptr. 340, 426 P.2d 908].) Again, no objection or request for admonition was made by defense counsel. (See *People* v. *Perry, supra,* 7 Cal.3d 756, 790.)[16]

The second ground urged in support of the motion for a new trial is that certain jurors who had personal knowledge of driving times over roads in the vicinity of the explosion advised other jurors to this effect. It affirmatively appears, however, that driving times were not discussed by the jurors during their deliberations.

---

[15] The record does not include, however, defense counsel's argument.

[16] Defendant makes reference to a further claimed prejudicial remark implying that defendant had conspired to rob a bank. The record does not support the making of such a remark by the prosecutor.

 Defendant urges as his third ground in support of his contention that the motion for a new trial should have been granted, that the verdict is contrary to the evidence. (Pen. Code, § 1181, subd. 7.) We will reverse the trial court's denial on this ground only in those instances when, as a matter of law, there is no substantial evidence in support of the verdict. (See *People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649].) Although the evidence does not compel a guilty verdict, it is manifest that it substantially supports such a verdict.

Defendant finally urges in support of his contention that the motion should have been granted that there was newly discovered evidence. (Pen. Code, § 1181, subd. 8.) Such evidence consists of a white hat claimed to have been worn by defendant, and his own opinion that Doolittle would have suffered the destruction of his ear drums had the explosive material been dynamite. According to defendant, a white cowboy hat by which defendant was identified by Attebury as the driver of a car which was seen near the scene of the explosion shortly thereafter, was not at all a hat unusual to the locality and for that reason could not have warranted Attebury's conclusion that defendant was the driver of the car. A second witness also testified that shortly after the explosion she saw a car driven by a man wearing "a big white hat that [defendant] wore when he came to [Priscilla's] house." The hat was not produced at trial and defendant asserted without explanation on the motion for a new trial that he had "now discovered the whereabouts" of the hat.

 A defendant on a motion for a new trial based on newly discovered evidence must show inter alia that the evidence is in fact newly discovered; that it is not merely cumulative to other evidence bearing on the factual issue; that it must be such as to render a different result probable on a retrial; and that the moving party could not, with reasonable diligence, have discovered and produced the evidence at trial. (*People* v. *Williams* (1962) 57 Cal.2d 263, 270 [18 Cal.Rptr. 729; 368 P.2d 353].) It is manifest that defendant's showing is insufficient. He has not persuasively shown (see *People* v. *Owens* (1967) 252 Cal.App.2d 548, 552 [60 Cal.Rptr. 687]) that either the hat or his opinion relative to Doolittle's ear drums is newly discovered; that the hat would not be merely cumulative to other substantial evidence relating defendant's identification as the perpetrator of the crime; that his opinion as to whether the force of the explosion would not be merely cumulative to other substantial evidence that dynamite was the explosive; that the evidence, if considered by the fact finder, would render a different result probable

on retrial; or that defendant could not with reasonable diligence have produced both items of evidence at trial.

■ A motion for a new trial on newly discovered evidence is looked upon with disfavor, and unless a clear abuse of discretion is shown, a denial of the motion will not be interfered with on appeal. (*People v. Williams, supra,* 57 Cal.2d 263, 270.) There is no basis in the instant case for interfering with the denial of the motion on the ground of the claimed newly discovered evidence, or on any of the other grounds asserted by defendant. (*People v. McGarry, supra,* 42 Cal.2d 429, 432-433.)

## Miscellaneous Contentions Urged in Defendant's Supplemental Pro Se Filings

We have heretofore considered defendant's contentions relative to his right to represent himself in the concealed weapon trial and to participate with counsel in the assault trial. He makes further complaint of conflicts which existed between him and the public defender in the assault trial relative to trial tactics and strategy employed by counsel. We construe these contentions as in the nature of a claimed denial of competent representation.[17] It is clear, however, that he was afforded an aggressive representation and that he is unable to demonstrate that the tactics employed by counsel deprived defendant of any defense or reduced his trial to a farce or a sham. (See *People v. Beagle* (1972) 6 Cal.3d 441, 458 [99 Cal.Rptr. 313, 492 P.2d 1]; *People v. Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].)

Defendant's remaining contentions, including allegations that the evidence is insufficient because the prosecutor produced evidence only of an intent to commit the murder of Attebury and not Doolittle in support of the charge of assault with intent to commit the murders of Attebury and Doolittle (charged as one count) (but see *People v. Ramirez* (1923) 64 Cal.App.3d 358, 360 [221 P. 960]), that the People used unspecified

---

[17]Defendant contends specifically that the concealed weapon charge should not have been severed for trial from the assault charge as had the jury been aware that he possessed a gun it would not have believed that he would have resorted to the more cumbersome plan of attacking the victims with explosives; that counsel sought to economize on expenditures of county funds and failed to subpoena a witness, the materiality of whose testimony defendant does not demonstrate; that counsel's strategy in the assault trial placed defendant in a position where he was compelled to admit possession of the gun on the concealed weapon charge—a fact for which there was other, independent compelling evidence.

perjured testimony and that the evidence is insufficient to support the verdict on the assault charge, do not merit discussion. As noted, defendant has filed with us petitions for the writ of habeas corpus and for other relief, in which applications he has asserted contentions which have been considered in our deliberations herein. We accordingly deny all such petitions and applications.[18]

The judgment is affirmed.

McComb, J., Tobriner, J., Mosk, J., Sullivan, J., Clark, J., and Richardson, J., concurred.

---

[18] Among other applications, petitioner requested that the record be augmented to include investigative reports and reporters' transcripts of various proceedings. Although we have not augmented the record on appeal we have ordered up, lodged and examined the complete trial court record herein.